UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| GREENLEAF COMPASSIONATE CARE CENTER, INC., )<br><br>Plaintiff, )<br><br>v. )<br><br>MATTHEW SANTACROCE, in his official capacity as Deputy Director of the Rhode Island Department of Business Regulation; ERICA FERRELLI, in her official capacity as Chief of the Office of Cannabis Regulation within the Rhode Island Department of Business Regulation; KIMBERLY AHERN, in her official capacity as Chair of the Rhode Island Cannabis Control Commission; ROBERT JACQUARD, in his official capacity as Commissioner on the Rhode Island Cannabis Control Commission; OLAYIWOLA ODUYINGBO, in his official capacity as Commissioner on the Rhode Island Cannabis Control Commission; and LOCAL 328 OF THE UNITED FOOD AND COMMERCIAL WORKERS UNION, )<br><br>Defendants. ) | C.A. No. 1:23-cv-00282 MSM-LDA |

**PLAINTIFF GREENLEAF COMPASSIONATE CARE CENTER, INC.'S**
**OPPOSITION TO STATE DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

PLAINTIFF GREENLEAF COMPASSIONATE CARE CENTER, INC.'S ............................... i

OPPOSITION TO STATE DEFENDANTS' MOTION TO DISMISS ...................................... i

TABLE OF CONTENTS .......................................................................................................... i

TABLE OF AUTHORITIES ................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................. 1

FACTUAL BACKGROUND .................................................................................................. 3

I.      The Rhode Island Cannabis Act Contains a Labor Peace Agreement Mandate to Enhance
        Union Leverage. ........................................................................................................... 3

        A.      In response to union pressure, Rhode Island added an LPA mandate to cannabis
                legislation. ......................................................................................................... 4

        B.      The purpose of the LPA Mandate is to increase union leverage in negotiations.... 5

II.     The LPA Mandate Accomplished its Goal and Deprived Greenleaf of Leverage in
        Negotiations. ................................................................................................................ 6

ARGUMENT ......................................................................................................................... 7

GREENLEAF HAS STANDING .......................................................................................... 7

TO CHALLENGE A REQUIREMENT THAT BINDS IT. .................................................. 7

I.      Greenleaf Satisfies the "Injury" Requirement Many Times Over. .................................. 8

        A.      Government-imposed obligations inflict an injury on regulated entities ............... 9

        B.      Infringement on NLRA rights creates an injury. ................................................ 11

        C.      The LPA Mandate injures Greenleaf by depriving it of leverage. ....................... 13

                1.      Loss of leverage, and resulting costs, are injuries. .................................. 13

                2.      Intangible effects on a regulated industry support standing. ................... 14

        D.      The Government Defendants' remaining arguments against injury are illogical
                and incorrect. .................................................................................................... 16

II.     Causation is Evident from the Nature of this Federal Preemption Case. .......................... 17

        A.      The LPA Mandate caused Greenleaf's injuries. ................................................ 17

        B.      The Government Defendants' arguments against causation fail. ......................... 18

                1.      The Government Defendants' cases are inapposite. ................................ 18

                2.      The Government Defendants' other arguments are no better. .................. 20

III.    Injuries from the LPA Mandate Will be Redressed if the LPA Mandate is Struck Down.
        ..................................................................................................................................... 22

        A.      This Court can provide redress when a state law infringes on Federal law. ........ 22

        B.      The Government Defendants' redressability argument ignores the law itself ...... 23

CONCLUSION ...................................................................................................................... 25

i

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Airline Serv. Providers Ass'n v. Los Angeles World Airports*,
    873 F.3d 1074 (9th Cir. 2017) ............................................................................ 2, 5, 13, 22, 24

*American Securities Ass'n v. United States Dep't of Lab.*,
    No. 8:22-CV-330-VMC-CPT, 2023 WL 1967573 (M.D. Fla. Feb. 13, 2023) ........................ 10

*Bennett v. Spear*,
    520 U.S. 154 (1997) .............................................................................................................. 18

*California v. Texas*,
    141 S. Ct. 2104 (2021) ........................................................................................................... 19

*Chevron, U.S.A., Inc. v. F.E.R.C.*,
    193 F. Supp. 2d 54 (D.D.C. 2002) ......................................................................................... 10

*Couser* v. *Shelby Cnty. Iowa*,
    No. 122CV00020SMRSBJ, 2023 WL 4420442 (S.D. Iowa July 10, 2023) ...................... 10, 18

*Dantzler, Inc. v. Empresas Berrios Inventory and Operations, Inc.*,
    958 F.3d 38 (1st Cir. 2020) .................................................................................................... 18

Draper v. Healey,
    98 F. Supp. 3d 77 (D. Mass. 2015) ........................................................................................ 14

*Feds for Medical Freedom v. Biden*,
    63 F.4th 366 (5th Cir. 2023) .................................................................................................... 9

*FPL Energy Maine Hydro LLC v. F.E.R.C.*,
    551 F.3d 58 (1st Cir. 2008) ........................................................................................ 3, 4, 7, 8, 14

*Golden State Transit Corp. v. City of Los Angeles*,
    475 U.S. 608 (1986) ...................................................................................................... 1, 11, 12

*Hillcrest Prop., LLP v. Pasco Cnty.*,
    731 F. Supp. 2d 1288 (M.D. Fla. 2010) ................................................................................. 11

*Iowa League of Cities v. E.P.A.*,
    711 F.3d 844 (8th Cir. 2013) ............................................................................................... 2, 9

*Jackson-Bey v. Hanslmaier*,
    115 F.3d 1091 (2d Cir. 1997) ................................................................................................. 11

*Lance v. Coffman*,
    549 U.S. 437 (2007)..................................................................................................... 7

*League of Women Voters v. Hargett*,
    400 F. Supp. 3d 706 (M.D. Tenn. 2019).................................................................... 10

*Lozano v. City of Hazleton*,
    620 F.3d 170 (3d Cir. 2010)........................................................................................ 9

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)................................................................................... 1, 7, 17, 22

*N.L.R.B. v. Ins. Agents' Int'l Union, AFL-CIO*,
    361 U.S. 477 (1960)................................................................................................... 12

*N.L.R.B. v. Jones & Laughlin Steel Corp.*,
    301 U.S. 1 (1937)...................................................................................................... 20

*Nebraska Beef Producers Comm. v. Nebraska Brand Comm.*,
    287 F.Supp.3d 740 (D. Neb. 2018)..................................................................... 10, 18

*Northern IL Chapter Builders v. Lavin*,
    No. 04 C 50357, 2005 WL 6046290 (N.D. Ill. Mar. 24, 2005) ...................... 2, 12, 24

*OMYA, Inc. v. Vermont*,
    80 F. Supp. 2d 211 (D. Vt. 2000).......................................................................... 2, 9, 17

*Outdoor Amusement Bus. Ass'n, Inc. v. Dep't of Homeland Sec.*,
    983 F.3d 671 (4th Cir. 2020) ..................................................................................... 11

*Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin.*,
    656 F.3d 580 (7th Cir. 2011) .......................................................................... 14, 15, 16

*Rhode Island Ass'n of Coastal Taxpayers v. Neronha*,
    No. CV 23-278 WES, 2023 WL 6121974 (D.R.I. Sep. 19, 2023)............................ 19

*Rhode Island Hosp. Ass'n v. City of Providence*,
    667 F.3d 17 (1st Cir. 2011)................................................................................... 2, 11

*Sanchez v. Off. of the State Superintendent of Educ.*,
    959 F.3d 1121 (D.C. Cir. 2020) .................................................................................. 9

*Sierra Club v. Morton*,
    405 U.S. 727 (1972).................................................................................................... 8

*Simon v. E. Kentucky Welfare Rts. Org.*,
    426 U.S. 26 ............................................................................................................... 19

*Spokeo, Inc. v. Robins,*
  578 U.S. 330 (2016) ........................................................................... 16

*State Farm Bank, F.S.B. v. D.C.,*
  640 F.Supp.2d 17 (D.D.C. 2009) ................................................... 9, 15

*Stilwell v. Off. of Thrift Supervision,*
  569 F.3d 514 (D.C. Cir. 2009) ......................................................... 17

*Terminix Int'l Co., L.P., v. Rocque,*
  210 F. Supp. 2d 97 (D. Conn. 2002) ............................................... 10

*Truck Drivers & Helpers Union, Loc. No. 170 v. N.L.R.B.,*
  993 F.2d 990 (1st Cir. 1993) ............................................................ 11

*U.S. E.P.A.,*
  990 F.2d 1531 (9th Cir. 1993) ......................................................... 18

*Vote Choice, Inc. v. Di Stefano,*
  814 F. Supp. 195 (D.R.I. 1993) ....................................................... 15

*Wine and Spirit Retailers, Inc. v. Rhode Island,*
  418 F.3d 36 (1st Cir. 2005) ........................................................... 8, 18

## Statutes

29 U.S.C. § 158(d) ............................................................................. 2, 11

R.I. Gen. Laws § 21-28.11-10 ............................................................... 6

R.I. Gen. Laws § 21-28.11-12.2(b) ...................................................... 10

R.I. Gen. Laws § 21-28.11-12.2(a)(2) ............................................. *passim*

## Other Authorities

S. 0568, LC002305, Jan. Sess. (R.I. 2021) ........................................... 4

S. 0568 Substitute A, LC002305/SUB A/3, Jan. Sess. (R.I. 2021) .............. 4

Greenleaf Compassionate Care Center, Inc. ("Greenleaf") hereby opposes the Government Defendants'[1] motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1).

## PRELIMINARY STATEMENT

In this federal preemption case, Greenleaf challenges a state requirement that applies to its business. A recent Rhode Island law requires all cannabis providers—such as Greenleaf—to secure and maintain a labor peace agreement ("LPA") with a labor organization as a mandatory condition of licensure. This requirement is preempted by the National Labor Relations Act ("NLRA") because, among other things, "[t]he NLRA requires an employer and a union to bargain in good faith, but it does not require them to reach agreement." *Golden State Transit Corp. v. City of Los Angeles*, 475 U.S. 608, 616 (1986).[2]

The Government Defendants claim that Greenleaf lacks standing because—they argue—Greenleaf has not suffered an injury that was caused by the law and that this Court can redress. They are wrong.

<u>First</u>, because Greenleaf is subject to the statutory requirement that it challenges, its standing is self-evident. "When the suit is one challenging the legality of government action or inaction," courts ask "whether the plaintiff is himself an object of the action (or forgone action) at issue. If he is, there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561-62 (1992). Businesses "have a concrete interest . . . in avoiding

---

[1] Matthew Santacroce, Deputy Director of the Rhode Island Department of Business Regulation; Erica Ferrelli, Chief of the Office of Cannabis Regulation within the Rhode Island Department of Business Regulation; Kimberly Ahern, Chair of the Rhode Island Cannabis Control Commission; and Robert Jacquard and Olayiwola Oduyingbo, Commissioners on the Rhode Island Cannabis Control Commission.

[2] A state may impose requirements beyond the NLRA if, among other factors, it is acting as a market participant and to protect its own proprietary interests. However, as explained in Greenleaf's Complaint, ¶¶ 29-50, Rhode Island has no relevant proprietary interests, and certainly none that require the protections of an LPA.

regulatory obligations above and beyond those that can be statutorily imposed upon them." *Iowa League of Cities v. E.P.A.*, 711 F.3d 844, 871 (8th Cir. 2013) (finding standing); *see also, e.g.*, *OMYA, Inc. v. Vermont*, 80 F. Supp. 2d 211, 215 (D. Vt. 2000) ("in cases where the permit conditions apply directly to the plaintiff, there is 'ordinarily little question that the action or inaction has caused injury and that a judgment preventing it or requiring the action will redress it.'").

Second, the deprivation of rights under the NLRA is an injury. When Rhode Island required cannabis businesses to secure an LPA, it took away Greenleaf's freedom not to reach an agreement. Businesses have standing when they face "a violation of their federally granted right to operate without entering agreements with a union[.]" *Northern IL Chapter Builders v. Lavin*, No. 04 C 50357, 2005 WL 6046290, at *1 (N.D. Ill. Mar. 24, 2005); *see also Airline Serv. Providers Ass'n v. Los Angeles World Airports*, 873 F.3d 1074, 1077 (9th Cir. 2017) (finding standing to challenge LPA requirement). The Government Defendants largely base their standing argument on the incorrect assertion that, even without the LPA mandate, Greenleaf would have been required to reach an agreement with the union. This is wrong; as stated above, the NLRA expressly "does not compel either party to agree to a proposal or require the making of a concession[.]" 29 U.S.C. § 158(d); *see also Rhode Island Hosp. Ass'n v. City of Providence*, 667 F.3d 17, 38 n.21 (1st Cir. 2011) ("states [that] attempt[] to compel agreement to a collective bargaining agreement, directly violat[e] the NLRA's directive that the obligation to bargain in good faith 'does not compel either party to agree to a proposal.'").

Third, the LPA requirement injures Greenleaf because it tilts (and tilted) bargaining leverage toward a union and away from Greenleaf. Regarding another LPA mandate, the Ninth Circuit explained: "if an employer may not operate without such an agreement, the employer

2

may need to give benefits to its employees to induce them to enter the agreement." *Id.* The First Circuit has held that a regulated entity suffered an injury when it would be "hostage" to a counterparty with "considerable leverage to impose stiffer requirements." *FPL Energy Maine Hydro LLC v. F.E.R.C.*, 551 F.3d 58, 62 (1st Cir. 2008). As discussed further below, Greenleaf's lost leverage has already resulted in specific monetary costs that it had to assume as a condition of securing the required LPA.

The standing requirement is simple. It "is meant to assure that a litigant in federal court has a 'concrete stake in a controversy." *Id.* As a regulated business, Greenleaf has a clear stake in challenging a law that regulates it and violates Federal law. Greenleaf also has a clear stake in challenging a law that deprives it of its federally-protected rights. Greenleaf further has a clear stake in challenging a law that has caused it financial harm and continues to do so. Moreover, Greenleaf has a clear stake in knowing whether a law that creates ongoing compliance obligations is valid or not.

## FACTUAL BACKGROUND

### I.    The Rhode Island Cannabis Act Contains a Labor Peace Agreement Mandate to Enhance Union Leverage.

When Rhode Island legalized adult-use cannabis in 2022, it required that any cannabis retailer, medical marijuana provider, or hybrid licensee must have a labor peace agreement ("LPA") with a union. This requirement infringes on the balance of rights and freedoms that the NLRA created. This particular requirement was designed to provide bargaining leverage to unions representing cannabis workers. If a cannabis business does not give a union enough concessions to secure an LPA, the cannabis business cannot operate at all.

A.    **In response to union pressure, Rhode Island added an LPA mandate to cannabis legislation.**

On March 9, 2021, a bill proposing the Cannabis Authorization, Regulation and Taxation Act (the "Cannabis Bill") was introduced in the Rhode Island General Assembly. S. 0568, LC002305, Jan. Sess. (R.I. 2021). Medical marijuana was already legal in Rhode Island; the Cannabis Bill, proposed *inter alia*, legalization and regulation of adult-use cannabis. When it was first introduced, the Cannabis Bill had no requirement that entities seeking licensure obtain an LPA. *Id.*

Subsequently, labor activists sought a requirement that employers enter into LPAs as a condition of licensure. The legislature agreed, and in June of 2021, the Cannabis Bill was revised to include a labor peace agreement mandate. S. 0568 Substitute A, LC002305/SUB A/3, Jan. Sess. (R.I. 2021). Following further revisions, the Cannabis Bill was enacted on May 25, 2022 as the Cannabis Act. The Cannabis Act provides in relevant part:

> All retail licensees, including retail licensees pursuant to § 21-28.11-10.2, hybrid cannabis retailers pursuant to § 21.28.11-10, and compassion centers licensed pursuant to chapter 28.6 of title 21 *shall, enter into, maintain, and abide by the terms of a labor peace agreement*, and shall submit to the commission an attestation by a bona fide labor organization stating that the applicant meets this section's requirements.

§ 21-28.11-12.2(b) (emphasis added) (the "LPA Mandate"). That is, the broad LPA Mandate reaches not just adult-use retailers, but also medical marijuana providers already licensed under the Medical Marijuana Act.

The Cannabis Act defines an LPA as "an agreement between a licensee and a bona fide labor organization that, at a minimum, protects the state's proprietary interests by prohibiting labor organizations and members from engaging in *picketing, work stoppages, boycotts*, and any other economic interference with the entity." R.I. Gen. Laws § 21-28.11-12.2(a)(2) (emphasis

4

added). If a cannabis business does not secure a union's agreement to forego these activities, the cannabis business cannot operate in Rhode Island.

### B. The purpose of the LPA Mandate is to increase union leverage in negotiations.

The LPA Mandate gives unions an invaluable piece of leverage. Because cannabis employers cannot do business in the state unless a union agrees to refrain from certain activity, and provides the required attestation, the LPA Mandate positions unions to extract valuable concessions. *See Airline Serv. Providers Ass'n*, 873 F.3d at 1077 (explaining, regarding an LPA requirement: "if an employer may not operate without such an agreement, the employer may need to give benefits to its employees to induce them to enter the agreement.").

That is why Local 328 of the United Food and Commercial Workers Union ("Local 328"), a defendant in this case, openly advocated for an LPA requirement. On May 7, 2021, Local 328 published a piece to its website about LPA mandates. It wrote: "By including this measure, Rhode Island policymakers will be putting working families first by giving them a seat at the table."[3] After a draft LPA requirement was included in the Cannabis Bill, but before the law was enacted, a representative of the United Food and Commercial Workers Union claimed that LPAs "are a proven formula for success, increasing pay, providing benefits and protections for workers in the industry."[4]

Rep. Scott Slater, who sponsored the bill in the House, confirmed that the LPA Mandate was designed to benefit employees. He reflected on the LPA Mandate, saying: "I was always

---

[3] *UFCW Local 328 Urges Policymakers to Pass Equitable and Just Cannabis Legislation in Rhode Island*, UFCW (May 7, 2021), https://ufcw328.org/ufcw-local-328-urges-policymakers-to-pass-equitable-and-just-cannabis-legislation-in-rhode-island/.

[4] *New Report: Cannabis Workers Unionizing Leads to High Quality Jobs and Increases Standards in Fast-Growing Industry*, UFCW5, https://ufcw5.org/2021/09/new-report-cannabis-workers-unionizing-leads-to-higher-quality-jobs-and-increases-standards-in-fast-growing-industry/.

open to making sure jobs, and not just folks lucky enough to get a license, but their employees, were protected and had protections."[5] He also "said lawmakers supported the labor peace agreement provision because they want the fledgling marijuana industry to provide good-paying, long-term jobs."[6]

While those goals may be sympathetic, the government cannot pursue them in a way that violates the NLRA. Greenleaf has standing to challenge this interference in the NLRA's deliberate balance between legal obligations and market forces.

## II.    The LPA Mandate Accomplished its Goal and Deprived Greenleaf of Leverage in Negotiations.

Greenleaf's workforce unionized in April of 2021, and its retail workers joined Local 328. Exhibit A, Declaration of Seth Bock (Greenleaf's CEO), ¶ 3. Following the unionization vote, Greenleaf and Local 328 participated in the collective bargaining process. *Id.* at ¶ 5. Local 328 and Greenleaf made progress on terms for a CBA but did not reach an agreement on wage-related issues. *Id.*

The collective bargaining process continued well into 2022, and with the clock ticking. *Id.* at ¶ 6. Under the Cannabis Act, licensed compassion centers were permitted to begin adult-use sales on December 1, 2022, pending approval of a hybrid retail license and provided that they had submitted the appropriate applications. R.I. Gen. Laws § 21-28.11-10. Compassion centers were not permitted to begin those sales without a labor peace agreement. *Id.* at § 21-

---

[5] Lavin, Nancy, *Cannabis dispensary lawsuit challenges labor provisions of recreational marijuana law*, RHODE ISLAND CURRENT (July 11, 2023), https://rhodeislandcurrent.com/2023/07/11/cannabis-dispensary-lawsuit-challenges-labor-provisions-of-recreational-marijuana-law/#:~:text=During%20the%20collective%20bargaining%20process,leverage%20through%20the%20LPA%20mandate.%E2%80%9D9D.

[6] Mooney, Tom, *Portsmouth pot dispensary sues over 'labor peace agreement' in state cannabis law*, The Providence Journal (July 11, 2023), https://www.providencejournal.com/story/news/2023/07/11/greenleaf-compassion-center-ri-pot-retail-marijuana-dispensary-suing-over-mandatory-labor-agreements/70401901007/.

28.11-12.2(c). As a direct result of the LPA Mandate, Local 328 secured substantial concessions from Greenleaf. The parties entered into a collective bargaining agreement (the "CBA"), with terms largely unfavorable to Greenleaf, on August 17, 2022. Ex. A, ¶ 11. This was just two negotiating sessions after the Cannabis Act was passed into law on May 25, 2022. *Id.* at ¶¶ 8, 11.

For well over a year, the parties had failed to come to terms on compensation-related matters. Once Greenleaf needed an LPA, it lost its ability to operate without a CBA, and it realized that it had to reach a CBA on any terms. *Id.* at ¶ 10. Following that realization, Greenleaf agreed to a CBA that included, *inter alia*, a one-time cash payment of one thousand dollars ($1,000) for all Local 328 members at Greenleaf with at least one year of service and fixed wages for a two-year period. *Id.* at ¶ 11.

## ARGUMENT

### GREENLEAF HAS STANDING
### TO CHALLENGE A REQUIREMENT THAT BINDS IT.

Article III standing is simpler, and more logical, than the Government Defendants would have it. As a cannabis business, Greenleaf's standing to challenge a cannabis licensing law is self-evident.

A plaintiff has standing when it establishes three elements: "injury in fact, causation, and redressability." *Lance v. Coffman*, 549 U.S. 437, 439 (2007). All three elements are easily satisfied here. "When the suit is one challenging the legality of government action or inaction," courts ask "whether the plaintiff is himself an object of the action (or forgone action) at issue. If he is, there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Lujan,* 504 U.S. at 561-62. "The standing requirement is meant to assure that a litigant in federal court has a 'concrete stake in a controversy.'" *FPL Energy Maine Hydro LLC,* 551 F.3d at 62. As a regulated business that must

comply with the LPA Mandate to obtain a necessary license, Greenleaf "has every incentive to litigate this case" and therefore has standing. *Id.* (entity subject to licensing regime had standing to challenge regulatory decision, even though it was allowed to continue operations).

As discussed further below, Greenleaf has suffered many injuries as a direct result of the LPA Mandate, including intrusion on its NLRA rights and loss of bargaining leverage. One major flaw with the Government Defendants' argument is that they acknowledge only one injury: the CBA that Greenleaf entered into with adverse terms. Another major flaw is that the Government Defendants deny that the LPA Mandate caused Greenleaf to enter into the CBA— even though, as Greenleaf's CEO attests, the LPA Mandate is why Greenleaf accepted adverse terms in the CBA. Even if the CBA were deemed an "indirect effect" of the LPA Mandate, and it is not, this argument would fail because "the fact that the deleterious effect of a statute is indirect will not by itself defeat standing." *Wine and Spirit Retailers, Inc. v. Rhode Island*, 418 F.3d 36, 45 (1st Cir. 2005). Having set a plan in motion, Rhode Island cannot pretend to be a mere observer when the plan works.

## I.     Greenleaf Satisfies the "Injury" Requirement Many Times Over.

The threshold for injury—the first element for standing—is low; even a decrease in "the aesthetic and recreational values of [an] area" constitutes an Article III injury. *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972). The Government Defendants argue that Greenleaf has alleged harm based only on Greenleaf's past and future CBAs with Local 328. Mem., 7.[7] While Greenleaf is harmed by the CBA, it has standing even without the current CBA. Greenleaf's injuries include government compelled or mandated action of entering into an LPA; deprivation

---

[7] The Government Defendants focus on this injury because they deny causing it. As discussed further below, Defendants may now wish to unlink the LPA Mandate from the CBA, but the LPA Mandate was created for this very purpose: to pressure employers into create union-favorable agreements.

of its rights under the NLRA; and loss of bargaining leverage (which has already manifested in past negotiation and will continue until the LPA Mandate is invalidated). These injuries more than suffice to allow Greenleaf the opportunity to ask this Court whether the NLRA preempts the LPA Mandate that Greenleaf was required to submit to in order to maintain and operate its business.

### A.    Government-imposed obligations inflict an injury on regulated entities.

As *Lujan* explained, when the plaintiff is a direct object of government action, there is "little question" that the action caused injury. Parties "have a concrete interest . . . in avoiding regulatory obligations above and beyond those that can be statutorily imposed upon them"; likewise, a plaintiff suffers an injury when it must "comply with . . . allegedly preempted regulations" or laws. *Iowa League of Cities*, 711 F.3d at 871; *State Farm Bank, F.S.B. v. D.C.*, 640 F.Supp.2d 17, 22 (D.D.C. 2009). "[I]n cases where the permit [or licensure] conditions apply directly to the plaintiff, there is 'ordinarily little question that the action or inaction has caused injury and that a judgment preventing it or requiring the action will redress it.'" *OMYA, Inc*, 80 F. Supp. 2d at 215.

The LPA Mandate requires Greenleaf to enter into an LPA; it also compels Greenleaf to enter into a CBA to secure the LPA. Government-compelled action is an injury—as many courts have recognized, in many contexts. *See, e.g.*, *Feds for Medical Freedom v. Biden*, 63 F.4th 366, 387 (5th Cir. 2023) (case concerning vaccine mandate for federal employees; "When a 'regulation is directed at [plaintiffs] in particular' and 'requires them to make significant changes,' plaintiffs have suffered an injury to challenge the order *even if* the Government has yet to elucidate the precise consequences of failing to comply."); *Sanchez v. Off. of the State Superintendent of Educ.*, 959 F.3d 1121, 1124 (D.C. Cir. 2020) (case concerning educational requirements for childcare providers; injury established where the plaintiffs were "subject to the

regulations" and "would need to take immediate steps to comply"); *Lozano v. City of Hazleton*, 620 F.3d 170, 185 (3d Cir. 2010) (preemption case concerning hiring and renting of undocumented immigrants; standing established where plaintiffs were "direct targets of an ordinance they allege to be unconstitutional, complaining of what that ordinance would compel them to do"), vacated on other grounds, 563 U.S. 1030 (2011).[8] Because Greenleaf is subject to government-compelled actions, it has standing to challenge the LPA Mandate. As discussed above, Greenleaf had to enter into an LPA and a CBA, on adverse terms, in order to comply with the LPA Mandate; Greenleaf also spent funds on legal advice regarding the LPA Mandate. Ex. A, ¶ 7.

The Government Defendants claim that "the Cannabis Act imposes no conditions on the employer" (Mem., 8), but the LPA Mandate explicitly puts its requirements on the employer: "All retail licensees . . . *shall, enter into, maintain, and abide by* the terms of a labor peace agreement, *and shall submit* to the commission an attestation by a bona fide labor organization stating that the applicant meets this section's requirements." R.I. Gen. Laws § 21-28.11-12.2(b).

The fact that Greenleaf ultimately secured a license has no effect on the standing analysis. As the Fourth Circuit recently recognized, when an employer receives "every labor

---

[8] *See also, e.g.*, *Couser* v. *Shelby Cnty. Iowa*, No. 122CV00020SMRSBJ, 2023 WL 4420442, at *7 (S.D. Iowa July 10, 2023) ("the application of an extensive regulatory regime to a corporation or individual creates an injury-in-fact.") (federal preemption case); *American Securities Ass'n v. United States Dep't of Lab.*, No. 8:22-CV-330-VMC-CPT, 2023 WL 1967573, at *10 (M.D. Fla. Feb. 13, 2023) ("compliance costs notwithstanding, Stephens' assertion that it must devote substantial time to comply with the new documentation requirements establishes an injury in fact."); *League of Women Voters v. Hargett*, 400 F. Supp. 3d 706, 718 (M.D. Tenn. 2019) (plaintiffs may establish standing "based on the fact that, but for the Act, they would behave in ways that the Act proscribes, and they, therefore, will imminently be forced to alter their behavior in response to the Act."); *Nebraska Beef Producers Comm. v. Nebraska Brand Comm.*, 287 F.Supp.3d 740 (D. Neb. 2018) ("when a state or local law imposes compliance burdens on those it regulates or controls, and compliance is coerced by the threat of enforcement, the controversy is both immediate and real"); *Terminix Int'l Co., L.P., v. Rocque*, 210 F. Supp. 2d 97 (D. Conn. 2002) ("DEP also challenges plaintiff's standing to bring this suit but Terminix has shown 'injury in fact' because it is being forced to comply with the regulation in question. Accordingly, Terminix does have standing."); *Chevron, U.S.A., Inc. v. F.E.R.C.*, 193 F. Supp. 2d 54, 60 (D.D.C. 2002) (internal citation omitted) (requirement "to comply with reporting regulations" constituted an injury).

certification" it seeks, but suffers "alleged costs" from "new rules," it has suffered an injury in fact and has standing to challenge the rules. *Outdoor Amusement Bus. Ass'n, Inc. v. Dep't of Homeland Sec.,* 983 F.3d 671, 680 (4th Cir. 2020). The injury is not the lack of certification or licensure—it is the illegally heightened burden that the employer submitted to. *See also Jackson-Bey v. Hanslmaier*, 115 F.3d 1091, 1096 (2d Cir. 1997) ("As a general matter, to establish standing to challenge an allegedly unconstitutional policy, a plaintiff must submit to the challenged policy."); *Hillcrest Prop., LLP v. Pasco Cnty.*, 731 F. Supp. 2d 1288, 1297-98 (M.D. Fla. 2010) ("the landowner's voluntary compliance with the County's regulatory process presents no impediment to standing. In fact, voluntary compliance is irrelevant."). The Government Defendants cannot have it both ways: requiring Greenleaf's compliance with the LPA, and then silencing Greenleaf from challenging that mandate.

## B.    Infringement on NLRA rights creates an injury.

The LPA Mandate deprives Greenleaf of its right, under the NLRA, not to reach an agreement with a union. The obligation to bargain collectively "does not compel either party to agree to a proposal or require the making of a concession[.]" 29 U.S.C. § 158(d). As the Supreme Court put it: "***The NLRA*** requires an employer and a union to bargain in good faith, but it ***does not require them to reach agreement***." *Golden State Transit Corp. v. City of Los Angeles*, 475 U.S. 608, 616 (1986) (emphasis added). Accordingly, "states [that] attempt[] to compel agreement to a collective bargaining agreement, directly violat[e] the NLRA's directive that the obligation to bargain in good faith 'does not compel either party to agree to a proposal.'" *Rhode Island Hospitality Ass'n*, 667 F.3d at 38 n.21 (emphasis added); *see also Truck Drivers & Helpers Union, Loc. No. 170 v. N.L.R.B.*, 993 F.2d 990, 996 (1st Cir. 1993) ("The NLRA requires that the parties meet and bargain in good faith, but does not require that they reach agreement.").

11

Ignoring this, the Government Defendants assert that nothing in the LPA Mandate "deprives employers of any rights conferred on them by the National Labor Relations Act[.]" Mem., 3; *see also id.* at 9. But it does: It deprives them of the right *not* to reach agreement.

As discussed further below, the employer's ability to operate without an agreement is important because it preserves the employer's leverage in negotiations. This is intentional: "The presence of economic weapons in reserve, and their actual exercise on occasion by the parties, is part and parcel of the system that the Wagner and Taft-Hartley Acts have recognized." *N.L.R.B. v. Ins. Agents' Int'l Union, AFL-CIO*, 361 U.S. 477, 489 (1960). Government requirements that "destroy[] the balance of power designed by Congress, and frustrate[] Congress' decision to leave open the use of economic weapons," are preempted. *Golden State Transit Corp.*, 475 U.S. at 619.

Employers suffer an injury when they are deprived of this statutory right to operate without a union agreement. An Illinois law regarding state building projects required grant recipients to "enter into a 'project labor agreement.'" *Northern IL Chapter Builders*, 2005 WL 6046290, at *1. This dissuaded some employers, who lacked such agreements, from bidding on those projects. Those employers complained of "a violation of their federally granted right to operate without entering agreements with a union[.]" *Id.* The court agreed that this infringed on the employers' right not to reach an agreement with a union, and that they therefore had standing to pursue their preemption argument. *Id.* Here, Greenleaf's rights were even more directly affected: Rhode Island requires an LPA for necessary licensure, not just for bidding on state projects.

### C.    The LPA Mandate injures Greenleaf by depriving it of leverage.

#### 1.    Loss of leverage, and resulting costs, are injuries.

Rhode Island's LPA Mandate deprives Greenleaf of the leverage that the NLRA deliberately preserved. In another labor peace agreement mandate case, the Ninth Circuit found that businesses operating at Los Angeles International Airport ("LAX") were injured by a rule "requir[ing] service providers to enter a 'labor peace agreement' with any employee organization that requests one." *Airline Serv. Providers Ass'n*, 873 F.3d at 1077. The Ninth Circuit acknowledged that—as the Government Defendants argue—"It might seem at first glance that a labor peace agreement would be detrimental to employees' interests because it deprives them of labor rights." *Id.* The Ninth Circuit corrected this misunderstanding: "In practice, however, if an employer may not operate without such an agreement, the employer may need to give benefits to its employees to induce them to enter the agreement." *Id.* (The Government Defendants seek to distinguish *Airline Serv. Providers Ass'n* by arguing that in that case, the LPA mandate would lead to time spent in negotiation and mediation. Mem., 8.  Compliance with the Rhode Island LPA Mandate also requires the union and employer (Greenleaf) to spend time negotiating terms, so that is no distinction at all. If anything, the Ninth Circuit's acknowledgement of spending time as an injury sufficient to establish standing illustrates just how low the injury threshold is and that it is easily met in this case.)

Here, as the Ninth Circuit explained, Greenleaf lost its leverage with Local 328, prompting it to agree to certain economic terms, including one-time bonuses and fixed hourly rates for a two-year period, that it would not have agreed to but for the LPA Mandate. Ex. A, ¶¶ 11-13. Those economic terms are tangible injuries that even the State Defendants do not attempt to deny.

13

The underlying loss of leverage is likewise an injury. The First Circuit has held that a regulated entity suffered an injury when it was deprived of a thirty-two-year license, even though that entity was still allowed to continue operations. *FPL Energy Maine Hydro LLC*, 551 F.3d at 62. The First Circuit found that the regulated entity was "hostage to further DEP [Department of Environmental Protection] Board proceedings in which the DEP Board has considerable leverage to impose stiffer requirements." *Id.* This sufficed to give the regulated entity "every incentive to litigate this case," and "its stake in the outcome [was] more than 'concrete' enough for Article III." *Id.* So too here. Greenleaf is "hostage to further" union negotiations in which the union "has considerable leverage to impose stiffer requirements" as a condition of providing the required LPA certification. The current CBA and LPA expire in August of 2024, and Local 328 has leverage to impose even stiffer obligations in exchange for renewing the LPA.

### 2.    Intangible effects on a regulated industry support standing.

The *FPL* decision is consistent with the general rule that a regulated entity has standing to sue for intangible injuries. For example, in *Draper v. Healey*, firearms dealers challenged a handgun regulation as facially vague. 98 F. Supp. 3d 77 (D. Mass. 2015). They alleged that they suffered from "ongoing uncertainty as to which firearms contain an acceptable load indicator," and the court agreed that uncertainty alone sufficed to establish injury and standing. *Id.* at 81. Similarly, when the government seeks to change behavior in a particular sector, even an attempt to influence behavior—such as, here, Rhode Island's decision to tilt the negotiating leverage toward unions—constitutes an injury. The Seventh Circuit has found that an organization representing truckers had standing to challenge a federal rule that might never have directly impacted those truckers, except by influencing their behavior. *Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin.*, 656 F.3d 580 (7th Cir. 2011). In that case, the

federal rule would require certain companies and truck drivers—only those with patterns of regulatory noncompliance—to use specific electronic monitoring devices ("EOBR"s) to collect, record, and transmit data from on board the truck. *Id.* at 584-85. A petition challenging the rule was filed the day before the rule became effective—before any trucker had even been subject to mandated electronic monitoring. *Id.* at 585.

Yet the Seventh Circuit found the injury requirement "easily met." *Id.* at 585. It quoted *Lujan* and found: "The three truck drivers are the 'objects of the action' here. . . . [T]he central purpose of the rule is to increase their compliance with [applicable] regulations." The EOBR rule was "a punitive stick . . . to increase compliance with [applicable] regulations." *Id.*

This was explicitly <u>not</u> a finding of present and grievous harm, or even of a current compliance burden. As the Seventh Circuit indicated, it was uncertain whether the plaintiff truck drivers would ever face the requirement. However, none of these caveats changed the analysis. The government was attempting to influence the truckers' behavior, so the truckers had standing to challenge the attempt. *See also Vote Choice, Inc. v. Di Stefano*, 814 F. Supp. 195, 204 (D.R.I. 1993) (candidate for office challenged public financing law; although she ultimately did "compete with a publicly funded candidate," she "was required to make a choice that colored her campaign strategy from the outset."); *State Farm Bank, F.S.B.*, 640 F.Supp.2d at 22 (a plaintiff's "having its business decisions interfered with" because of regulations was an injury; plaintiff challenged regulations as federally preempted).

As with the truck drivers, the "central purpose" of the LPA Mandate was to influence Greenleaf's behavior. Rhode Island never had any real interest in whether cannabis workers went on strike. Instead, the LPA Mandate was designed to give unions leverage in negotiations over terms and conditions of employment, causing cannabis businesses to enter into union-favorable

CBAs. This has already happened, and for as long as the LPA Mandate is in place, Greenleaf will face the risk of an unfavorable CBA every time it must bargain with the union, which it must next do in the summer of 2024. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016) ("the risk of real harm" can establish standing).

### D.     The Government Defendants' remaining arguments against injury are illogical and incorrect.

The Government Defendants deny that Greenleaf has lost leverage "simply because it is required to agree that employees will <u>not</u> go on strike." Mem., 7. But Greenleaf is incapable of "agreeing," by itself, that employees will not strike. It must secure the *employees'* agreement (through their union). And in order to secure that agreement—as the Ninth Circuit explained—an employer must make concessions to the union's demands. The Government Defendants' argument relies entirely on the disingenuous claim that Greenleaf can get something for nothing.

The Government Defendants argue that Greenleaf is not harmed because, they claim, the LPA Mandate merely requires *employees* to relinquish certain rights.[9] That position is not only wrong because, *inter alia*, the LPA Mandate expressly requires Greenleaf to enter into an LPA for licensure; it is self-defeating. If the LPA Mandate were as trivial and employer friendly as they claim, there would have been no reason to include it in the Cannabis Act because employer behavior would already match it. The LPA Mandate must be designed to affect employer conduct; states do not pass laws that are planned to have no impact.[10]

Courts of Appeals have rejected similar attempts to create a compliance burden and then—in a bid to defeat standing—deny that it is a burden at all. *See Owner-Operator*

---

[9] *See, e.g.*, Mem., 9-10 ("The labor peace agreement mandate benefits Greenleaf by ensuring the smooth operation of retail of recreational cannabis.")

[10] The Government Defendants mention that the Union itself inserted an LPA into the CBA with Greenleaf. Exactly. Greenleaf never asked for one; the Union inserted it in anticipation of the union-friendly LPA Mandate, for which the Union was lobbying.

*Independent Drivers Ass'n, Inc.,* 656 F.3d at 586 ("In the end, it strikes us as odd that the Agency is arguing that it must have a strict rule now to get truck drivers to be more compliant with HOS rules, but at the same time it is asserting that these rules are not meant to change anyone's immediate behavior enough to confer standing to challenge that regulation."); *Stilwell v. Off. of Thrift Supervision*, 569 F.3d 514, 518 (D.C. Cir. 2009) (finding it "more than a little ironic" that the agency "would suggest Petitioners lack standing and then, later in the same brief," label the petitioner a "prime example" of the "very problem the [r]ule was intended to address"). The Government Defendants' gambit does not merit serious consideration.

## II.      Causation is Evident from the Nature of this Federal Preemption Case.

Causation—the second standing element—is plain from the nature of this case. As *Lujan* explained, when "the plaintiff is himself an object of the [government] action (or forgone action) at issue . . . there is ordinarily little question that the action or inaction has ***caused*** him injury[.], and that a judgment preventing or requiring the action will ***redress*** it." *Lujan*, 504 U.S. at 561-62 (emphasis added). A law setting forth licensing requirements for Greenleaf's industry necessarily creates direct consequences for Greenleaf.

### A.      The LPA Mandate caused Greenleaf's injuries.

The LPA Mandate directly caused the injuries discussed above. The LPA Mandate deprived Greenleaf of its rights under the NLRA. It directly required Greenleaf to enter into an LPA and forced Greenleaf to enter into a CBA in order to obtain that LPA. It is difficult to think of any "causation" more direct than a law's deprivation of rights or imposition of obligations. *See OMYA, Inc.*, 80 F.Supp.2d at 214 ("The causal connection between restriction on the number of truck trips on Route 7 and OMYA's inability to make more trips than are allowed is, clearly, direct.").

17

The LPA Mandate also directly deprived Greenleaf of leverage in its negotiations with the union: The only path toward an LPA is to offer a union something in return, which is the very purpose of the mandate. The LPA Mandate even caused Greenleaf to agree to economic terms it would not have otherwise. Ex. A, ¶ 13. The Government Defendants attempt to use Local 328 as a shield, but "the fact that the deleterious effect of a statute is indirect will not by itself defeat standing." *Wine and Spirit Retailers, Inc.*, 418 F.3d at 45; *see also id.* ("The requirement that an alleged injury be fairly traceable to the defendant's action does not mean that the defendant's action must be the final link in the chain of events leading up to the alleged harm. Nor does that requirement exclude injuries produced by 'coercive effect upon the action of someone else.'") (citing *Bennett v. Spear*, 520 U.S. 154, 168-69 (1997); *Cent. Ariz. Water Conserv. Dist. v. U.S. E.P.A.*, 990 F.2d 1531, 1538 (9th Cir. 1993) ("While [plaintiff]'s contractual obligations may provide the basis for its economic liability for the increased costs imposed by the Final Rule, that hardly means that the Final Rule itself is not the direct cause of that liability."). For the purposes of standing, the LPA Mandate caused the adverse CBA terms.

The LPA Mandate also caused Greenleaf to spend time and legal fees on compliance. Ex. A, ¶ 7 (paid for legal advice about the LPA Mandate); *see Couser,* 2023 WL 4420442, at *8 (finding causation where "The Ordinance is the reason [plaintiff] must engage a wide range of compliance measures."); *Nebraska Beef Producers Comm.*, 287 F.Supp.3d at 749 ("it is equally evident that those fees and regulatory burdens are traceable to the Brand Committee's enforcement of the Brand Act, and that enjoining that enforcement would redress the injury.").

**B.    The Government Defendants' arguments against causation fail.**

**1.    The Government Defendants' cases are inapposite.**

None of the Government Defendants' cited cases sever this clear causal link. They fail to offer any case denying causation where a law imposed requirements on a regulated industry, and

18

an industry participant challenged the law as preempted or otherwise invalid. Their cited cases involve entirely different circumstances. *See, e.g.*, *Dantzler, Inc. v. Empresas Berrios Inventory and Operations, Inc.*, 958 F.3d 38, 47-48 (1st Cir. 2020) (quoted at Mem., 10) (plaintiff was not the direct target of the law and proposed only "a bare hypothesis" of impact); *Simon v. E. Kentucky Welfare Rts. Org.*, 426 U.S. 26, 28; 40 (1976) (IRS provided favorable tax treatment to a hospital; third-parties lacked standing to challenge that tax treatment).

The Government Defendants also fail to offer any case denying causation where government actors required one entity to enter into an agreement with another. Their only case that even approaches this topic is entirely inapposite because it addressed a law with no enforcement mechanism. *California v. Texas*, 141 S. Ct. 2104, 2114 (2021) (quoted at Mem., 10) (health insurance mandate had no enforcement mechanism and therefore "there is no possible Government action that is causally connected to the plaintiffs' injury"). Here, there is no question that Greenleaf was, and is, required to comply as a condition of operating in the state, and that the Government Defendants are actively enforcing the LPA Mandate. In particular, the Government Defendants do not and will not allow licensure absent an LPA.

Because the Government Defendants actively enforce the LPA Mandate, the Government Defendants' reliance on *Rhode Island Ass'n of Coastal Taxpayers v. Neronha* also fails. No. CV 23-278 WES, 2023 WL 6121974 (D.R.I. Sep. 19, 2023). In that case, property owners could not challenge a law, that had never been enforced against them, by suing the Attorney General and other agency heads. *Id.* at 3. The court explained: "Pre-enforcement injunctions against prosecutorial agencies are a rare bird." *Id.* Greenleaf does not face some theoretical risk of prosecution; it faces a statutory requirement as a mandatory condition of licensure, and licenses are granted—or denied—by the Government Defendants based on that LPA Mandate.

### 2.    The Government Defendants' other arguments are no better.

The Government Defendants do acknowledge that a defendant can, through coercion, sufficiently "cause" the actions of a third party for standing purposes. Mem., 10. They deny that the LPA Mandate coerced Greenleaf, but their denials cannot survive a moment of scrutiny.

The Government Defendants assert that Greenleaf is not required "to enter into a labor peace agreement with the same labor organization which it has a collective bargaining agreement with." Memorandum in Support of Motion to Dismiss ("Memorandum"), 14. The Government Defendants apparently think this is a strong argument, repeating the claim: "nor does the Cannabis Act require Greenleaf to maintain a labor peace agreement exclusively with Local 328." *Id.* at 15.

This claim is nonsensical—both legally and logically. Greenleaf's employees already voted to be represented by Local 328, so Greenleaf cannot enter into an agreement with a different union. The Supreme Court has "said that the obligation to treat with the true representative was exclusive and hence imposed the negative duty to treat with no other." *N.L.R.B. v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 44 (1937). Greenleaf's employees would have had a legitimate grievance if Greenleaf had informed them that they could not strike because some unrelated organization promised they would not.

In fact, on July 19, 2022, National Labor Relations Board ("NLRB") Field Agent Charlotte Davis wrote to the Rhode Island Department of Business Regulation, which has oversight responsibility for cannabis:

> Under the Act, it is an unfair labor practice for an employer to fail or refuse to bargain collectively, with the exclusive collective-bargaining representative over employees' terms and conditions of employment, and *attempting to circumvent that obligation by negotiating agreements with other labor organizations concerning the collective-bargaining unit would constitute a separate violation of the Act.*

Exhibit B (emphasis added). This discredits the Government Defendants' claim to the contrary; they are flatly wrong when they assert: "Nor does the Cannabis Act require Greenleaf to maintain a labor peace agreement exclusively with Local 328." Mem., 15.

Moreover, even if this were otherwise legal, the Government Defendants provide no explanation of how an unrelated union could have authority to provide assurances that employees *the union does not represent* will refrain from "picketing, work stoppages, boycotts, and any other economic interference with the entity." R.I. Gen. Laws § 21-28.11-12.2(a)(2). Nor do they explain why an unrelated union would be willing to provide such an agreement.

In another misguided vein, the Government Defendants claim: "[T]he Cannabis Act does not require Greenleaf to be a party to a collective bargaining agreement, the NLRB does." Mem., 15. They posit that if Greenleaf was already required to enter into a CBA, the LPA Mandate could not have been coercive. But the NLRB never did—and, legally, never could[11]—require Greenleaf to be a party to a CBA. In support of their claim to the contrary, the Government Defendants cite two documents issued by the NLRB: a Certification of Representative and a Notice of Bargaining Obligation. Mem., 13; Ex. D. A bargaining obligation is not an obligation to reach an agreement. As discussed above, under the NLRA, this is a deliberate and crucial distinction.

The Government Defendants confuse the timeline to obfuscate the connection between the CBA and the LPA Mandate. First, they mention that Greenleaf and Local 328 had been negotiating for nearly a year before the Cannabis Act (Mem., 13), but that merely confirms that the LPA Mandate served as a catalyst the CBA. Greenleaf and Local 328 negotiated without an agreement for over a year until the LPA Mandate was law, and then they quickly reached terms

---

[11] As discussed above, under the NLRA, employers have the right not to reach an agreement.

as Greenleaf had no other choice. Next, the Government Defendants state that the CBA was signed months before Greenleaf submitted its application. Mem., 13. That does not help their case: Greenleaf needed an LPA for that application, and it had nothing to gain by waiting another two weeks or two months. Its negotiating position would not have improved in the interim. Finally, the Government Defendants argue that some (non-economic) items in the ultimate CBA reflected Greenleaf's proposals. Mem., 13-14. This does not change Greenleaf's injuries. As explain above, and as Greenleaf's CEO attests, Greenleaf would not have agreed to one-time bonuses or to fixed wages for a two-year period but for the LPA Mandate. Ex. A, ¶ 13.

The Government Defendants' denial of causation is an absurd attempt to distract from the truth: Rhode Island enacted the LPA Mandate to give bargaining leverage to unions. And, at Greenleaf, they got it.

**III.      Injuries from the LPA Mandate Will be Redressed if the LPA Mandate is Struck Down.**

**A.      This Court can provide redress when a state law infringes on Federal law.**

The third and final element—redressability—is equally plain. When "the plaintiff is himself an object of the [government] action (or forgone action) at issue . . . there is ordinarily little question that . . . a judgment preventing or requiring the action will *redress* it." *Lujan*, 504 U.S. at 561-62 (emphasis added). Greenleaf's injuries from the LPA Mandate will be redressed by a declaration that the LPA Mandate is unenforceable. *See Airline Service Providers Ass'n*, 873 F.3d at 1079 (finding redressability: "If, as the Complaint requests, section 25 were enjoined on the basis of preemption by federal labor law . . . the ASPA's members would not suffer any adverse consequences of complying with it.").

In particular, if this Court declares the law preempted, Greenleaf will no longer be deprived of its right under the NLRA not to reach an agreement; it will no longer be compelled

to obtain an LPA or to agree to a CBA, which is the only way for a business with a unionized

workforce to secure an LPA. As a result, Greenleaf will not be artificially deprived of

negotiating leverage, and both Greenleaf and the Union will be restored to their positions under

the NLRA.

**B.**    **The Government Defendants' redressability argument ignores the law Itself.**

Here, the Government Defendants return to their pattern of pretending that the executed

CBA is Greenleaf's only injury.[12] It is not. This case is a federal preemption challenge to the

LPA Mandate. Even if this Court does not invalidate the current CBA—although Greenleaf

respectfully asks that it does—a declaration from this Court invalidating the LPA Mandate will

redress most of Greenleaf's injuries by restoring it to its rights under the NLRA and restoring it

to its proper bargaining position next time it negotiates with Local 328.

In their argument against redressability, the Government Defendants also return to their

incorrect assertion that the NLRA requires Greenleaf to enter into a CBA. Mem., 16 (describing

"Greenleaf's current harm" as "the active collective bargaining agreement *that the NLRA*

*requires of Greenleaf*.") (emphasis in original). As discussed above, the NLRA requires no such

thing. Greenleaf seeks a return to its rights under the NLRA, which is relief this Court is

empowered to provide.

*    *    *

The Government Defendants seek to shield a law from preemption review in perpetuity.

They deny that an employer—whether Greenleaf or any other—could ever have standing to

challenge the requirements of the LPA Mandate or the adverse CBAs that flow from it. They

---

[12] They argue: "Greenleaf's request that the labor peace agreement provision in the Cannabis Act be declared void would not redress Greenleaf's current harm, which is the active collective bargaining agreement[.]" Mem., 16.

23

indicate that, at most, the LPA Mandate might deprive *employees* of their NLRA rights, but the suggestion that employees would challenge it is a fantasy. Local 328, representing Greenleaf employees, lobbied for the LPA Mandate in the first place. The Government Defendants' motion is nothing less than a bid for the LPA Mandate to be shielded from any judicial review.

To the extent that the Government Defendants have defenses to the preemption challenge, they still have every opportunity to bring them. The plaintiff's standing is merely a preliminary question—as demonstrated by two other cases regarding labor agreement mandates. In *Airline Serv. Providers* and *Lavin*, the Ninth Circuit and the Northern District of Illinois each found that the labor agreement mandate at issue had been issued in the government's capacity as a market participant (as opposed to as a regulator) and therefore was not preempted. *Airline Serv. Providers Ass'n*, 873 F.3d at 1080; *Lavin*, 2005 WL 6046290, at *2. Yet both courts reached those conclusions *after* finding that there was standing. When a state changes the delicate balance of obligations and freedoms that the NLRA established, the employers suffer an injury on that basis alone (among other injuries suffered here), and they therefore have standing.

## CONCLUSION

For the foregoing reasons, Greenleaf respectfully asks this Court to deny the Government Defendants' Motion to Dismiss so that this case may proceed to the merits.[13]

Respectfully submitted,

GREENLEAF COMPASSIONATE
CARE CENTER, INC.

Dated: October 31, 2023

By its attorneys,

/s/ *Erika L. Todd*
Gerry Silver
(admitted *pro hac vice*)
SULLIVAN & WORCESTER LLP
1633 Broadway
New York, NY 10019
(T) (212) 660-3096
(F) (212) 660-3001
gsilver@sullivanlaw.com

Erika L. Todd
(admitted *pro hac vice*)
SULLIVAN & WORCESTER LLP
One Post Office Square
Boston, MA 02109
(T) (617) 338-2825
(F) (617) 338-2880
etodd@sullivanlaw.com

/s/ *Adam M. Ramos*
Adam M. Ramos (#7591)
*armos@hinckleyallen.com*
Craig M. Scott (#4237)
*cscott@hinckleyallen.com*
HINCKLEY ALLEN
100 Westminster Street, Suite 1500
Providence, RI 02903
(T) (401) 274-2000
(F) (401) 277-9600

---

[13] Greenleaf requests oral argument, with twenty minutes for the Plaintiff and twenty minutes for the Defendants (collectively).

## CERTIFICATE OF SERVICE

I hereby certify that I served a copy of the within document via mail, e-mail and/or the electronic filing system on this 31st day of October 2023 on:

Marc Gursky, Esq.                          Chelsea Baittinger, Esq.
GURSKY, WIENS & SHANLEY,                    Special Assistant Attorney General
Attorneys at Law, Ltd.                      *CBaittinger@riag.ri.gov*
20 Centerville Road                         Office of the Attorney General
Warwick RI 02886                            150 South Main St.
*mgursky@rilaborlaw.com*                    Providence, RI 02903

The document is available for viewing and/or downloading from the Rhode Island Judiciary's Electronic Filing System.

/s/ *Erika L. Todd*
Erika L. Todd

26